KONDUROS, J.:
**173 The Town of Sullivan's Island (the Town) and the Town of Sullivan's Island Board of Zoning Appeals (BZA) (collectively, Appellants) appeal the circuit court's order reversing the BZA's decision to affirm the zoning administrator's denial and limitation of permits requested by Paul Boehm to make certain alterations to his building and nearby structures. Appellants contend the circuit court erred in determining (1)
**174 Boehm's building was a second principal building, rather than an accessory structure and (2) Boehm could expand the building. We affirm.
THE TOWN'S ZONING ORDINANCES
The application of the Town's zoning ordinances to Boehm's property is a tortured one involving multiple requests for alterations, building inspectors, and zoning reviews. To aid in application to the facts, we provide the relevant portions of those ordinances before discussing the facts.
(1) Principal Building Coverage Area. The Lot Area covered by the Principal Building measured vertically downward from the Principal Building's exterior walls to the ground (also known as the building footprint area), but excludes areas covered only by:
(a) accessory structures not readily useable as living space;
(b) exterior porches and decks; and,
(c) exterior stairs.
(2) Principal Building. A building or buildings in which the principal use of the lot is conducted. The term also specifically applies to multiple dwellings located on the same lot, including an historic structure used as an accessory dwelling unit.
Town of Sullivan's Island, S.C., Zoning Ordinance (T.Z.O.) § 21-25(A) (2007). "No Principal Building shall be erected, altered or moved so as to exceed thirty-eight (38) feet in overall height." T.Z.O. § 21-54(A)
"Accessory structures shall.... [n]ot exceed 15 feet in height, except that the height may be extended to 18 feet where the pitch of the accessory structure[']s roof is not less than seven on twelve (7/12)...." T.Z.O. § 21-138(A)(3)(a). The Zoning Ordinances provide an accessory structure cannot have a separate electric meter or be connected to the sewer system. T.Z.O. § 21-138(A)(7).
In the event that two or more Principal Buildings occupy a single lot, said occupancy shall constitute a nonconforming use. One structure shall be designated conforming and the other(s) shall be non-conforming under the following procedure:
**175 (1) If a request to improve the property is received, the Zoning Administrator shall designate the Principal Building with the greatest livable square footage, including porches, as a conforming use and the other Principal Buildings as non-conforming.
(2) The designation of conforming and non-conforming Principal Buildings shall be recorded on the Certificate of Occupancy that is on file in the Town Hall.
(3) A Building Permit for improvements to the designated conforming Principal Building may be considered favorably, provided all other requirements of the Town Ordinances are met. The non-conforming structure(s) shall be regulated in accordance with Subsections A-E.
T.Z.O. § 21-150(F) (emphasis added).
"A Nonconforming Use is a land use that was legally established but that is no longer *877 allowed by the use regulations of the Zoning District in which it is located.... A Nonconforming Use shall not be expanded except to eliminate or reduce the nonconforming aspects ." T.Z.O. § 21-150(A), (B) (emphasis added). "A Nonconforming Structure is any building or structure that was legally established but no longer complies with the density, lot coverage, floor area, height and dimensional standards of this Zoning Ordinance. Nonconforming Structures may remain, subject to the regulations of this Article." T.Z.O. § 21-151(A). For nonconforming structures, "[s]tructural alterations, including enlargements, are permitted if the structural alteration does not increase the extent of nonconformity ." T.Z.O. § 21-151(B)(1) (emphasis added).
(1) Incidental repairs and normal maintenance necessary to keep a Nonconforming Structure in sound condition are permitted unless such repairs are otherwise expressly prohibited by this Zoning Ordinance.
(2) Nothing in this Article will be construed to prevent Structures from being structurally strengthened or restored to a safe condition, in accordance with an official order of a public official.
T.Z.O. § 21-149(F).
The following relevant definitions are provided by the Town's zoning ordinance. T.Z.O. § 21-203. "Principal Use. The specific, primary purpose for which land or a building is used."
**176 Id. "Building, Principal. [ ]A building in which the principal use of the lot is conducted." Id. "Accessory Use or Structure. A use or structure subordinate to the Principal Building on a lot and used for purposes customarily incidental to the main or principal use or building and located on the same lot." Id. "Garage, private. An accessory building or portion of a Principal Building used only for the private storage of motor vehicles, campers, boats, boat trailers and lawn mowers, as an accessory use." Id.
Dwelling. A building or portion of a building arranged or designed to provide living quarters for a single family, with no structural features impeding free access throughout the entire structure by all members of the family.
....
Dwelling, Single Family. A detached Principal Building other than a mobile home designed for or occupied exclusively by a single family on a single lot.
Dwelling, Upper Story. An attached dwelling constructed as an integral part of a non-residential Principal Building located on the second floor.
Id. The definition for Residence simply states "See 'Dwelling.' " Id.
Nonconforming Structure. Any building or structure that was legally established but no longer complies with the density, lot coverage, floor area, height and dimensional standards of this Zoning Ordinance.
Nonconforming Use. A land use that was legally established but that is no longer allowed by the use regulations of the Zoning District in which it is located.
Nonconformities. Uses, structures, lots, signs and other situations that came into existence legally and continued to exist as a legal nonconforming use until the time of the adoption of this ordinance but that do not conform to one or more requirements of this Zoning Ordinance.
Id.
FACTS/PROCEDURAL HISTORY
This case involves structures on real property Boehm bought in 2001 located at 2720 Goldbug Avenue on Sullivan's Island, South Carolina. In addition to the principal residential **177 building (main house), Unit B is a building with a garage on the ground level and an apartment located above the garage. Unit B is completely separate from the main house, has its own electric meter, and is connected to the sewer system. It received a certificate of occupancy on November 20, 1989.[1]
In 2001, the Town issued Boehm a permit to build a "slat house"[2] immediately adjacent, *878 but not attached, to Unit B. In 2003, Boehm divided the property into two condominiums. Boehm conveyed ownership of the main house to his son but retained ownership of Unit B. In 2009, Boehm applied for a variance to attach the slat house roof to the walkway at the back of Unit B, but the building official denied it and the BZA affirmed the denial.
In 2013, Boehm requested a building permit to increase the roof height of Unit B by two feet. The Town's zoning administrator denied Boehm's request. The zoning administrator noted: "Because accessory structures are permitted a maximum height of 18 feet, the detached garage/unit is already exceeding the maximum height allowed (22-24 feet), and therefore would not allow your requested height increase of two feet." The zoning administrator granted Boehm a permit to establish a roof overhang to cover the outside steps to the entrance of the apartment portion of Unit B. However, the administrator later determined the posts for the roof were outside of the building footprint and issued a stop work order. He additionally observed alterations to the back deck-including connecting the slat house to Unit B, removing handrails, and installing built-in furniture and planters. The administrator determined Boehm had not obtained permits for those alterations and issued citations.
Boehm appealed the zoning administrator's decisions to the BZA, which held a public hearing on the matter. At that hearing,[3] Boehm testified that when he was considering buying **178 the property at 2720 Goldbug, he discussed the property with the zoning administrator at that time, Kent Prause. Boehm provided he asked Prause what it meant to have the two structures on one property. He contended Prause informed him "the larger of the two dwellings would be the conforming dwelling[ ] and the smaller of the two dwellings ... would be the nonconforming dwelling."[4] Boehm further asserted he relied on Prause's statements in deciding to purchase the property. Boehm also indicated he has had a rental license every year he has owned Unit B and has rented it out, first to his son and later to regular tenants. He maintained he does not park vehicles in the bottom part; he instead uses it to store furniture and "junk." He stated that to the best of his knowledge, it had never been used by the main house as a garage.
Boehm also testified that in 2001, Prause advised him to build the slat house as an accessory structure to Unit B to serve as a deck. According to Boehm, Prause explained a slat house was a garden structure that if it was the same height as the existing deck/walkway, would serve the purpose of the deck. Boehm asserted the slat house was an accessory building to Unit B. Boehm stated the occupants of Unit B had to climb over the rail to access the deck. Boehm indicated that in 2009, he applied for a variance and the then zoning administrator, Randy Robinson, denied it citing section 21-150(F) of the Town Zoning Ordinance, which is entitled "Two or more Principal Buildings on one lot."[5] He also testified that in 2010, Robinson gave him permission to screen in the slat building. Boehm further explained he had built the benches on the slat house roof to serve as a safety rail because he was previously told he could not install a safety rail.
Boehm further testified that in 2013, while Robinson was still zoning administrator, they met to discuss elevating the roof on Unit B. Boehm claimed Robinson told him he could **179 raise the roof by two feet and suggested a specific contractor to contact for an estimate. Boehm indicated he did not have the plans to raise the roof drawn before the current zoning administrator, Joe Henderson, took office. According to Boehm, Henderson denied the application because Unit B was a garage.[6] Boehm requested Frank Timko, the former building official who issued the Certificate *879 of Occupancy for Unit B in 1989, send a letter to Henderson. That letter stated: "Both [another official] and I determined that the property at 2720 Goldbug prior to [Hurricane Hugo] had 2 habitable dwelling structures. The main house ... was determined to be the conforming princip[al] building. The garage apartment ... was determined to be the non-conforming princip[al] building." Boehm further described how Henderson had stated in an email to him that if Unit B was a principal building, Boehm would be allowed to raise the roof two feet. Boehm testified on cross-examination he did not obtain permits for the benches because he did not realize he needed a permit to install furniture.
Additionally, Boehm testified that in regards to the roof covering the stairs and walkway, he obtained a permit and began building it. He indicated the "side 6 footers" and "the 4 footers in back" were put in and Robinson[7] inspected and approved them. Boehm claimed the construction company poured the concrete for the footers the next day, installed the posts two days later, and two days after that Robinson posted a stop work order. Henderson also sent a letter to Boehm listing the violations. Boehm indicated he obtained and submitted to Robinson a letter from an architect indicating the roof posts needed to be placed where they were to maintain "the structural integrity of the existing deck walkway."
Henderson also testified at the hearing. He stated that because the certificate of occupancy for Unit B refers to it as an apartment above garage, it is a garage. He indicated an **180 apartment is a dwelling. He asserted for Unit B to be a principal building, the certificate of occupancy "would have to not say 'garage.' " He admitted the ordinance defines a garage as either an accessory building or a portion of a principal building. He stated the principal use of 2720 Goldbug is residential and the apartment is residential. He also indicated the use of Unit B was residential. He claimed raising the roof height of Unit B would increase the volume and square footage. He noted under the Zoning Ordinance, a building's footprint does not include "decks, walkways, or stairs." He believed that because of that definition, the Town probably should not have issued Boehm the permit to build a roof over the stairs in the first place. He indicated building the roof and replacing the stairs made the stairs stronger and last longer and thus, intensified the use. Robinson spoke and took issue with Boehm's characterization of their past conversations. Robinson also provided that what really mattered was if "a permit is applied for, reviewed, and approved," not what he opined to a property owner.
On April 10, 2014, the BZA determined Unit B was a garage with an apartment on the top floor. Specifically, the BZA affirmed the (1) denial of a request to increase the roof height of Unit B by two feet; (2) issuance of a stop work order for construction beyond the scope of the work illustrated on a building permit; and (3) issuance of violations related to the alteration of the slat house. Boehm appealed the BZA's decision to the circuit court. The circuit court determined "[t]he BZA made no factual findings as to why [Unit B] was a garage" according to the Town's Zoning Ordinance and remanded the matter to the BZA with instructions to make findings of fact "to support [its] conclusion that the structure at issue is a garage under the terms of the Zoning Ordinance."
On January 8, 2015, the BZA held another public meeting and adopted six findings of fact to support its prior decision. Those findings were as follows:
1. The certificate of occupancy for the upstairs living quarters issued November 20, 1989[,] classified the apartment as an apartment above garage. This certificate of occupancy refers to the structure as a garage and the apartment as being above the garage....
**181 2. The inspection ticket issued November 20, 1991[,] approved the use of apartment over garage. This document shows a request and approval of the use of the apartment over the garage. ...
3. The May 15, 2001 survey of 2720 Goldbug Avenue ... identifies the structure as *880 garage with apartment. The survey identifies the owner of the property at the time of the survey as ... Boehm, the applicant. The Board finds that the identification of the building on this survey as a garage with an apartment is further support for the Board's finding that the structure is a non-conforming accessory structure. The survey does not identify the structure as a residence, dwelling, house, principal building or apartment. The survey identifies the structure as a garage, noting that the garage structure includes an apartment. ...
4. The design of the structure, which can be readily observed by reference to the photographs, drawings, documents and testimony in the record, is that of a garage that has an apartment on top. There are two garage doors on the front of the structure, which open to the bays. The only entrance to the apartment above the garage is the staircase on the exterior right side of the structure. The structure is designed for the private storage of cars, boats, trailers, lawn equipment or other recreational items. ...
5. [Boehm] agreed in his testimony before the Board that the structure is comprised of a garage on the first floor and an apartment on the second floor. [Boehm] characterized the structure as a dwelling with a garage below it, but did not dispute that the first floor was indeed a garage. In fact, a real estate listing from [Boehm's] real estate company described the first floor of the secondary structure as follows: "a garage for two cars, a storage/workshop area for your favorite hobbies. Instead of cars put a pool table and ping pong table in the garage." When asked about this listing, [Boehm] continued to characterize the structure as a dwelling with a garage below it. ...
6. The Board finds that the structure at issue and use of the structure as a garage with a non-conforming apartment on the second story is customarily incidental to the principal use in building located on the lot, a principal building used as a residence. The Board recognizes the structures on the **182 lot are now part of a condo regime, but finds that the establishment of the condo regime does not convert an accessory structure into a second principal building.
The Board concluded these findings all supported its determination "the structure is a non-conforming accessory structure"-"an accessory structure with a nonconforming, but approved, apartment use on the second floor."
Boehm again appealed to the circuit court. On April 7, 2015, the circuit court held a hearing on the matter. The circuit court found (1) none of the BZA's findings supported its decision Unit B was a garage or an accessory structure; (2) Unit B was a nonconforming principal building under the zoning ordinance; and (3) Boehm was allowed to make the requested structural additions to Unit B. This appeal followed.
STANDARD OF REVIEW
"[S]ection 6-29-840 [of the South Carolina Code] prescribes the standard of review a circuit court should apply when considering an appeal from a local zoning board." Austin v. Bd. of Zoning Appeals , 362 S.C. 29, 35, 606 S.E.2d 209, 212 (Ct. App. 2004). That section provides "[t]he findings of fact by the board of appeals must be treated in the same manner as a finding of fact by a jury, and the court may not take additional evidence." S.C. Code Ann. § 6-29-840(A) (Supp. 2017). A jury's factual findings will not be disturbed on appeal unless the record contains no evidence reasonably supporting the jury's findings. Austin , 362 S.C. at 35, 606 S.E.2d at 212.
"On appeal, we apply the same standard of review as the circuit court below.... In reviewing the questions presented by the appeal, the court shall determine only whether the decision of the [b]oard is correct as a matter of law." Id. at 33, 606 S.E.2d at 211. "However, a decision of a municipal zoning board will be overturned if it is arbitrary, capricious, has no reasonable relation to a lawful purpose, or if the board has abused its discretion." Id. (quoting Rest. Row Assocs. v. Horry Cty. , 335 S.C. 209, 216, 516 S.E.2d 442, 446 (1999) ). "An abuse of discretion occurs when a trial court's decision is unsupported by the evidence or controlled by an error of law."
*881 Newton v. Zoning Bd. of Appeals for Beaufort Cty. , 396 S.C. 112, 116, 719 S.E.2d 282, 284 (Ct. App. 2011) (quoting **183 Cty. of Richland v. Simpkins , 348 S.C. 664, 668, 560 S.E.2d 902, 904 (Ct. App. 2002) ).
LAW/ANALYSIS
I. Accessory Building[8]
Appellants contend the circuit court improperly substituted its judgment for the BZA's as the standard of review required deference to the BZA. Appellants also argue the circuit court incorrectly interpreted the zoning ordinance. Appellants assert no party disputes Unit B includes both a garage and an apartment and under the zoning ordinance, a garage can be either an accessory structure or part of a principal building. Appellants also contend Unit B fails to meet the zoning ordinance's definition of a dwelling because it does not have free access through the entire structure-the ground level garage and the second floor apartment have separate exterior entrances. We disagree.
A court will not substitute its judgment for the judgment of the board in a zoning law case. Rest. Row Assocs. v. Horry Cty. , 335 S.C. 209, 216, 516 S.E.2d 442, 446 (1999).
The court may not feel that the decision of the board was the best that could have been rendered under the circumstances. It may thoroughly disagree with the reasoning by which the board reached its decision. It may feel that the decision of the board was a substandard piece of logic and thinking. None the less, the court will not set aside the board's view of the matter just to inject its own ideas into the picture of things.
Id. (quoting Talbot v. Myrtle Beach Bd. of Adjustment , 222 S.C. 165, 173, 72 S.E.2d 66, 70 (1952) ). A "[z]oning [b]oard's findings of fact are final and conclusive on appeal." Bishop v. Hightower , 292 S.C. 358, 360, 356 S.E.2d 420, 421 (Ct. App. 1987). However, "[a] reviewing court in a zoning case may rely on uncontroverted facts which appear in the record, but not in a zoning board's findings." Vulcan Materials Co. v. Greenville Cty. Bd. of Zoning Appeals , 342 S.C. 480, 491, 536 S.E.2d 892, 898 (Ct. App. 2000).
**184 "[I]ssues involving the construction of an ordinance are reviewed as a matter of law under a broader standard of review than is applied in reviewing issues of fact." Helicopter Sols., Inc. v. Hinde , 414 S.C. 1, 9, 776 S.E.2d 753, 757 (Ct. App. 2015) (alteration by court) (quoting Mikell v. Cty. of Charleston , 386 S.C. 153, 158, 687 S.E.2d 326, 329 (2009) ). "Although great deference is accorded the decisions of those charged with interpreting and applying local zoning ordinances, a broader and more independent review is permitted when the issue concerns the construction of an ordinance." Id. at 9-10, 776 S.E.2d at 757 (quoting Mikell , 386 S.C. at 158, 687 S.E.2d at 329 ).
This court has noted "we review a zoning ordinance to give it a 'practical, reasonable and fair interpretation consonant with the purposes, design, and policy of the lawmakers.' " Vulcan Materials Co. , 342 S.C. at 489, 536 S.E.2d at 897 (quoting City of Myrtle Beach v. Juel P. Corp. , 337 S.C. 157, 177, 522 S.E.2d 153, 164 (Ct. App. 1999), rev'd , 344 S.C. 43, 543 S.E.2d 538 (2001) ). "As with statutes, the lawmakers' intent embodied in an ordinance 'must prevail if it can be reasonably discovered in the language used.' " Id. at 490, 536 S.E.2d at 897 (quoting Charleston Cty. Parks & Recreation Comm'n v. Somers , 319 S.C. 65, 67, 459 S.E.2d 841, 843 (1995) ). "The Board['s] ... construction of its own ordinance, the enforcement of which it is charged with, should be given some consideration and not overruled without cogent reason therefor." Purdy v. Moise , 223 S.C. 298, 304-05, 75 S.E.2d 605, 608 (1953).
This deferential standard of review does not mean a zoning board can never be reversed. In Wyndham Enterprises, LLC v. City of North Augusta , 401 S.C. 144, 151, 735 S.E.2d 659, 663 (Ct. App. 2012), this court reversed the circuit court's decision to affirm the BZA "because the BZA's decision was not supported by competent, substantial, and material evidence, and was based on opinion and speculation testimony." Further, in *882 Bannum, Inc. v. City of Columbia , 335 S.C. 202, 204-05, 516 S.E.2d 439, 439-40 (1999), the supreme court found the zoning board's denial of a permit for an exception was arbitrary and reversed the denial. The court found the zoning board "either discounted or disregarded every single bit of evidence put up by" the appellant and "[i]nstead, it based its **185 holding on the four factors submitted by" the opponents to the exception. Id. at 205, 516 S.E.2d at 440-41. Additionally, in Helicopter Solutions, Inc. , 414 S.C. at 9-10, 776 S.E.2d at 757-58, this court affirmed the circuit court's reversal of the zoning board, finding the circuit court's decision was based on the construction of an ordinance-which was a legal conclusion, not a factual finding.
"[I]n the area of statutory construction, our role is limited to determining legislative intent and effectuating that intent." Eagle Container Co. v. Cty. of Newberry , 379 S.C. 564, 570, 666 S.E.2d 892, 895 (2008). "All rules of statutory construction are subservient to the one that legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in light of the intended purpose of the statute." Id. (quoting McClanahan v. Richland Cty. Council , 350 S.C. 433, 438, 567 S.E.2d 240, 242 (2002) ). " '[W]ords in a statute must be construed in context,' and 'the meaning of particular terms in a statute may be ascertained by reference to words associated with them in the statute.' " Id. at 570, 666 S.E.2d at 895-96 (alteration by court) (quoting S. Mut. Church Ins. Co. v. S.C. Windstorm & Hail Underwriting Ass'n , 306 S.C. 339, 342, 412 S.E.2d 377, 379 (1991) ). "The language must also be read in a sense [that] harmonizes with its subject matter and accords with its general purpose." Id. at 570, 666 S.E.2d at 896 (quoting Hitachi Data Sys. Corp. v. Leatherman , 309 S.C. 174, 178, 420 S.E.2d 843, 846 (1992) ). "If a statute's language is plain and unambiguous and conveys a clear and definite meaning, there is no occasion for employing rules of statutory interpretation and the court has no right to look for or impose another meaning." Id. at 570-71, 666 S.E.2d at 896 (quoting Miller v. Doe , 312 S.C. 444, 447, 441 S.E.2d 319, 321 (1994) ).
A use in the zoning context "is '[t]he purpose or activity for which land or buildings are designed, arranged, or intended, or for which land or buildings are occupied or maintained.' " Heilker v. Zoning Bd. of Appeals for the City of Beaufort , 346 S.C. 401, 407, 552 S.E.2d 42, 45 (Ct. App. 2001) (alteration in original) (quoting Town of Kingstown v. Albert , 767 A.2d 659, 664 (R.I. 2001) ); see also Bonaventure Int'l, Inc. v. Borough of Spring Lake , 350 N.J.Super. 420, 795 A.2d 895, 901 (2002) ("When a municipality adopts a zoning ordinance or **186 when an existing zoning ordinance is changed, inevitably there will be uses which are newly prohibited and structures which do not conform with the bulk requirements. These are known as nonconforming uses and structures respectively. ... [A] nonconforming structure may house a nonconforming use."). "A determination by a zoning board that a particular purpose or activity does or does not constitute a 'use' is a finding of fact." Heilker , 346 S.C. at 412, 552 S.E.2d at 48. " '[N]onconforming use' and 'vested right' refer to the same concept-a use of property [that] existed lawfully before the enactment of a zoning ordinance may continue afterwards even though the use does not comply with the zoning restriction." Vulcan Materials Co. , 342 S.C. at 496 n.13, 536 S.E.2d at 900 n.13.
"[T]he substantial value of property lies in its use. If the right of use [is] denied, the value of the property is annihilated, and ownership is rendered a barren right." Vulcan Materials Co. , 342 S.C. at 499, 536 S.E.2d at 902 (second alteration by court) (quoting James v. City of Greenville , 227 S.C. 565, 579, 88 S.E.2d 661, 668 (1955) ). "A landowner acquires a vested right to continue a nonconforming use already in existence at the time his property is zoned in the absence of a showing that the continuance of the use would constitute a detriment to the public health, safety or welfare." Id. at 498, 536 S.E.2d at 901 (quoting F.B.R. Inv'rs v. Cty. of Charleston , 303 S.C. 524, 527, 402 S.E.2d 189, 191 (Ct. App. 1991) ); see also Friarsgate, Inc. v. Town of Irmo , 290 S.C. 266, 269, 349 S.E.2d 891, 893 (Ct. App. 1986) ("Generally, in American jurisdictions a landowner who uses his property for a lawful purpose before the enactment of zoning which subsequently prohibits that use may continue the nonconforming use after the enactment of *883 zoning unless the use clearly constitutes a public nuisance. Otherwise, the landowner would be deprived of a constitutionally protected right.").
"Vested rights under zoning ordinances are undergirded by the same constitutional footing which precludes retroactive application of zoning ordinances." Friarsgate, Inc. , 290 S.C. at 269, 349 S.E.2d at 893. The majority rule regarding vested rights, as recognized by this court, provides:
A landowner will be held to have acquired a vested right to continue and complete construction of a building or structure, **187 and to initiate and continue a use, despite a restriction contained in an ordinance or an amendment thereof where, prior to the effective date of the legislation and in reliance upon a permit validly issued, he has, in good faith, (1) made a substantial change of position in relation to the land, (2) made substantial expenditures, or (3) incurred substantial obligations.
Id. (quoting 4 A. Rathkopf, The Law Of Zoning and Planning Section 50.03 (1986) ).
"[T]he intention of all zoning laws, as regards a nonconforming use of property, is to restrict and gradually eliminate the nonconforming use." Christy v. Harleston , 266 S.C. 439, 443, 223 S.E.2d 861, 863 (1976). "[W]hether construction of a new structure to house an existing nonconforming use is permissible, depends primarily on the applicable zoning ordinance." Id.
Our supreme court has defined accessory uses as
those which are customarily incident to the principal use. "In order to qualify as a use incidental to the principal use of a nonconforming premises, such use must be clearly incidental to, and customarily found in connection with, the principal use to which it is allegedly related." 101A C.J.S. Zoning & Land Planning § 154, p. 479. An accessory use must be one "so necessary or commonly to be expected that it cannot be supposed that the ordinance was intended to prevent it." Borough of Northvale v. Blundo , 85 N.J.Super. 56, 203 A.2d 721, 723 (1964).
Whaley v. Dorchester Cty. Zoning Bd. of Appeals , 337 S.C. 568, 579, 524 S.E.2d 404, 410 (1999) (citation omitted).
In the present case, the circuit court properly determined Unit B was a second principal building. "A 'use' in the zoning context is 'the purpose or activity for which land or buildings are designed, arranged, or intended, or for which land or buildings are occupied or maintained.' " Heilker , 346 S.C. at 412, 552 S.E.2d at 48. The zoning ordinance likewise defines the principal use as "[t]he specific, primary purpose for which land or a building is used." T.Z.O § 21-203. The zoning ordinance also defines a principal building as "[a] building or buildings in which the principal use of the lot is conducted. The term also specifically applies to multiple dwellings **188 located on the same lot, including an historic structure used as an accessory dwelling unit." T.Z.O. § 21-25(A)(2). The purpose of the lot at 2720 Goldbug is residential. Unit B meets the definition of a principal building because its use is the same as the rest of the property-residential.
Further, Unit B does not fit the definition of a garage in the Zoning Ordinance, which is a building "used only for the private storage of motor vehicles, campers, boats, boat trailers and lawn mowers," none of which are stored in Unit B according to the record. T.Z.O § 21-203. Further, Unit B is taller than allowed by the Town's Zoning Ordinance requirements for an accessory building and has a sanitary sewer hookup, an electric meter, and its own accessory buildings, all of which are not permitted for a garage or an accessory building. Additionally, the definition of a garage includes that it can be a part of a principal building although the ordinance states that one must be able to access the garage through the residential portion, which is not possible with Unit B. Although a few aspects of Unit B do not fall cleanly within the zoning ordinance's definition of a residential principal building, this is not unusual as it is a nonconforming structure. If it cleanly met all requirements, it would not be nonconforming. At the hearing, the current zoning administrator and his immediate predecessor disputed that Unit B is a second principal residence, instead maintaining it must be an accessory building because it is a garage, as demonstrated by the description of the building as an apartment over a garage and their belief that it looks like a garage. Even though our standard of review is deferential *884 to the Board, the record contains no evidence to support the Board not finding Unit B is a second principal building.
The denial of Boehm's request for a variance in 2009 cited to both subsection 21-150(B) and (F)(3), listing subsection (F) first. Subsection B pertains to expansion of nonconforming uses. Subsection F deals only with two principal buildings on one lot; if this was not the case with 2720 Goldbug, the zoning administrator would have had no reason to reference it, as it would already have been covered by subsection B. Subsection (F)(3), which is what is specifically cited to in the 2009 order, states the nonconforming principal building is regulated by subsections A through E; hence, the citation to subsection B.
**189 Additionally, BZA's order regarding the denial of his permit application in 2009 stated the building official's denial of the application "to connect the slat house to the other deck and house " was affirmed. (emphasis added). Further, the letter from the former Town official from the time when Unit B received its certificate of occupancy stated it is a second principal building. Additionally, Boehm testified the zoning administrator in place when he bought the building told him the same. Accordingly, we find the circuit court did not err in finding Unit B was a second principal building.
II. Principal Building
Appellants maintain the circuit court erred by finding Boehm was not precluded from making substantial alterations to the structure-raising the roof height, connecting the slat house, and extending the roof over the outdoor staircase- even if Unit B was in fact a nonconforming principal building. Appellants argue Boehm's proposed structural alterations to Unit B increased the extent of the nonconformity and were prohibited. We disagree.
As zoning ordinances in South Carolina can vary in each town or city, no South Carolina case has considered the exact situation here. The Town's zoning ordinance contains two key provisions related to the issue here. For a nonconforming structure, "[s]tructural alterations, including enlargements, are permitted if the structural alteration does not increase the extent of nonconformity." T.Z.O. § 21-151(B)(1). Second is a "Nonconforming Use shall not be expanded except to eliminate or reduce the nonconforming aspects." T.Z.O. § 21-150(B).
"There is no hard and fast rule to determine when an improvement amounts to an extension of a nonconforming use or a change in use. 'Each case must be considered and determined on its own facts.' " Cohen v. Duncan , 970 A.2d 550, 564 (R.I. 2009) (citation omitted) (quoting Santoro v. Zoning Bd. of Review of Warren , 93 R.I. 68, 171 A.2d 75, 77 (1961) ).
"Expansion of a nonconforming use means expansion of the nonconforming features of the building in which the use is being operated." 4 Edward H. Ziegler Jr., Rathkopf's The Law of Zoning and Planning § 73:16 (4th ed.). "[T]he prevailing **190 national rule [is] that the addition of new facilities or the enlargement of existing ones is a prohibited expansion or extension of the non-conforming use if it is incompatible with the permitted use or if the nature of the use substantially changes ." City of New Orleans v. JEB Props., Inc. , 609 So.2d 986, 989 (La. Ct. App. 1992).
Many states have relied on a three-part test to determine what constitutes a change or substantial extension of a prior nonconforming use of land: (1) whether the use reflects the nature and purpose of the use prevailing when the zoning bylaw took effect; (2) whether there is a difference in the quality or character, as well as the degree, of use; and (3) whether the current use has a different effect on the neighborhood. See, e.g. , Bio Energy, LLC v. Town of Hopkinton , 153 N.H. 145, 891 A.2d 509, 519 (2005) ; Raymond v. Zoning Bd. of Appeals of City of Norwalk , 76 Conn.App. 222, 820 A.2d 275, 297 (2003) ; Oakham Sand & Gravel Corp. v. Town of Oakham , 54 Mass.App.Ct. 80, 763 N.E.2d 529, 533 n.5 (2002) ; JEB Props., Inc. , 609 So.2d at 989-90 ; McKemy v. Baltimore Cty. , 39 Md.App. 257, 385 A.2d 96, 103-04 (1978).
In a case from the Supreme Court of New Hampshire, the dwelling at issue was nonconforming because (1) it was situated on a lot smaller than the minimum prescribed size; (2) it was too close to the adjoining lot lines; and (3) it contained three family units while located in an area zoned for single and two-family residences only.
*885 Town of Seabrook v. D'Agata , 116 N.H. 472, 362 A.2d 182, 183 (1976). The property owners "constructed an addition to their dwelling consisting of a twenty-eight by eight foot storage room in a formerly unoccupied area under the second floor of a portion of the building." Id.
The supreme court found the property owners' enclosure of the carport did not constitute " 'an expansion of the non-conforming use .' " Id. (emphasis added). The court interpreted the phrase non-conforming use to mean
an expansion in the non-conforming features of the dwelling, rathto [sic] the zoning ordinance and which is in fact commonly found in the defendants' neighborhood. The defendants' storage room neither constitutes living quarters for another family nor does it affect the proximity of the **191 dwelling to the sidelines. It does not enlarge the square footage of the dwelling so as to render the lot size proportionally more inadequate. To deny the defendants the right to build within the confines of their building a structure identical to that possessed by many of their conforming neighbors is in effect to penalize them for the nonconforming nature of their property.
Id. (emphasis added).
In the present case, subsection 21-150(B) of the Town Ordinance, which is referenced by subsection (F), provides a "Nonconforming Use shall not be expanded except to eliminate or reduce the nonconforming aspects." For a nonconforming use, if the town had intended "[u]se shall not be expanded" to mean the volume of a nonconforming building cannot be increased, it should have used that exact terminology, as some other places have done. See In re Carrigan Conditional Use & Certificate of Compliance , 198 Vt. 438, 117 A.3d 788, 793 (2014) (providing in that case, "the bylaws allow[ed] a noncomplying structure to be 'enlarged, expanded or moved,' " as long as any modification did " 'not increase the degree of noncompliance' and noting 'degree of noncompliance' " was defined as " '[t]he extent to which the footprint, height, or total area (volume) of a structure does not comply with the requirements of these regulations' " (emphasis added) ). Simply because the height of Unit B would be increased, does not mean the use would be expanded or the extent of the nonconformity increased. Additionally, placing the posts for the roof outside of the footprint of the stairs would enlarge the footprint for the stairs but not necessarily expand the use or nonconformity of Unit B. Further, the Zoning Ordinance explicitly excludes stairs and decks as part of the footprint. T.Z.O. § 21-25(A)(1). Moreover, the part of the Zoning Ordinance concerning nonconforming structures specifically allows the structure to be enlarged if it "does not increase the extent of nonconformity." T.Z.O. § 21-151(B)(1).
If Boehm is allowed to increase the height of Unit B by two feet, Unit B will still be under the maximum height allowed for a principal building by the Zoning Ordinance. See T.Z.O. § 21-54(A). Further, the purpose or use of Unit B would not change if Boehm is allowed to make any of the alterations he requested. Unit B was and still will be a residence. A change **192 in use would be if a residence were to become a business, an industrial site, or a farm. Boehm's requested changes do not even change Unit B from a one-family to a multiple-family residence. As explained in Section I, Unit B is nonconforming because it is the second residence on the lot. With Boehm's proposed changes, the lot will still have just two residences. Further, the proposed changes do not add bedrooms or increase the square footage/floor space and does not occupy any more space on the lot. Therefore, Boehm's changes would not increase Unit B's nonconformance.
Additionally, the benches and planters on the deck/slathouse do not change the purpose of Unit B. Further, the benches allow the apartment to "be put to productive use" in allowing occupants to use the slat house safely. T.Z.O. § 21-149(B). Moreover, a roof over a stairway does not change the purpose and was approved; for safety Boehm slightly increased the area it covered from the original proposal. Boehm's architect provided the posts for the roof over the stairs were moved out from the original plan to ensure the integrity of the existing deck walkway. The Zoning Ordinance provides "[n]othing in this [a]rticle will be construed to prevent [s]tructures from being structurally strengthened." T.Z.O. § 21-149(F)(2). The roof protects the stairs from weather, which *886 the zoning administrator acknowledged, testifying the roof would make the stairs last longer. The roof allows occupants to enter the apartment regardless of weather and protects the stairs from wear and tear from weather. T.Z.O. § 21-149(B). The Zoning Ordinance specifically allows the protection of property already in place, i.e., the stairs, which are being exposed to the weather and are the only means of access to the second floor. T.Z.O. § 21-149(F). See Crawford v. Bldg. Inspector of Barnstable , 356 Mass. 174, 248 N.E.2d 488, 490 (1969) ("It is the case of repairs replacing rotted exposed parts of a building, and alterations to preserve the replaced parts from deterioration by weather and to improve the appearance of the building rather than to enlarge the use of the building. Whatever enlargement followed the alteration (and there was none whatever so far as overall floor space was concerned) was negligible rather than substantial and was incidental rather than purposeful."). Therefore, as Unit B is a second principal building, none of the proposed alterations **193 increased the nonconformity or expanded the nonconforming use. Accordingly, the circuit court's reversal of the Board's denial of Boehm's three appeals is
AFFIRMED.
WILLIAMS, J., and LEE, A.J., concur.

The record conflicts as to whether or not Unit B or another building other than the main house was in existence prior to Hurricane Hugo, which made landfall on Sullivan's Island on September 21, 1989.

A slat house is a type of arbor or garden structure.

During the hearing, in response to an objection by Boehm's attorney, a member of the BZA noted because the BZA was not a court, court rules did not apply.

Over Boehm's objection, a member of the BZA stated she had spoken by telephone to Prause that day and he told her he did not tell Boehm this.

The order from the Board regarding this variance states Robinson referenced subsections 21-150(B) and (F)(3) when determining the variance application should be denied.

Henderson noted at the hearing he had been with the Town for "[a]bout nine months."

The record indicates Robinson remained involved in some capacity with the Town Zoning office when Henderson became the zoning administrator, but the record is unclear as to what his new position was.

Appellants raise this as their second issue in their brief but we reverse the order in which we address their arguments.